IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:15CR178 |
| vs. | |
| CUC THI SCHAEFFER, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the court on the Request for *Jackson v. Denno* Hearing (Filing No. 119) and a Motion to Suppress Evidence and Statements (Filing No. 121) filed by Cuc Thi Schaeffer (Schaeffer). Schaeffer is charged in the Second Superseding Indictment with conspiracy to distribute and possess with intent to distribute a thousand kilograms or more of marijuana in violation of 21 U.S.C. § 846. **See** Filing No. 70. Schaeffer seeks to suppress any and all evidence pertaining to the search of Schaeffer's person, residence, and property on November 8, 2013.

The court granted Schaeffer's motion for hearing (Filing No. 119), which was held for both motions on June 22, 2016. Schaeffer was represented by John S. Berry, Jr. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. The court heard the testimony of Officer Patrick High (Officer High) and Officer Chad Rowlett (Officer Rowlett) of Fairfield Police Department, and Brian Haines (Haines). The court received into evidence the following exhibits: Search Warrant and Affidavit (Ex. 1); Officer High Affidavit (Ex. 2); and Search Warrant Return (Ex. 3). A transcript (TR.) of the hearing was prepared and filed on June 29, 2016 (Filing No. 143).

**FINDINGS OF FACT**

On October 23, 2013, law enforcement officers working at the FedEx facility in Indianapolis, Indiana, intercepted two packages of cash addressed to Kimberly Robinson (K. Robinson) from Brian Robinson (B. Robinson) (Ex. 2 p. 4). The Fairfield Police Department was notified about the packages and began investigating B. Robinson (Ex. 2 p. 4). Both B. Robinson and K. Robinson were arrested the next day

after B. Robinson picked up the packages containing a combined total of $289,400.00 in U.S. Currency (Ex. 2 p. 5). Officers searched K. Robinson and B. Robinson, as well as their residence (Ex. 2 p. 5). The search of B. Robinson's property uncovered contacts between B. Robinson and Schaeffer, including:

1. a spreadsheet with line items of capital, including the purchase of a tractor, and an RV (Ex. 2 p. 6);
2. two real estate magazines for eastern California, including land in Pilot Hill, El Dorado County that Schaeffer owns and rents to tenant, John Acosta (Acosta) ( Ex. 2 p. 7);
3. an invoice for an RV repair dated 4/4/2013 with the handwritten name "Cuc Schaeffer" (Ex. 2 p. 7);
4. a receipt from Robinson Sand and Gravel to "Cook" at 6200 Blarney, Pilot Hill [sic] (Ex. 2 p. 8);
5. a customer invoice and receipts from Home Depot for Schaeffer (Ex. 2 p. 8);
6. a copy of an email to SchaefferCuc@yahoo.com from mrichardson@loomistank.com, regarding the purchase of a water tank (Ex. 2 p. 8);
7. a power bill statement to 2329 Edison Avenue, Sacramento, a property Schaeffer owns and rents to tenants (Ex. 2 p. 8);
8. receipts with "C" written on them, presumed by law enforcement to stand for "Cuc" (Ex. 2 p. 8);
9. receipts to a general store in Cool, California, which is near Pilot Hill, California, where Schaeffer owns land and rents to a tenant (Ex. 2 p. 9); and
10. several receipts showing purchases for cash, associated with items on the spreadsheets and receipts for gas, tolls, ice, propane, and hydroponic products (Ex. 2 p. 9).

Based on the evidence found at B. Robinson's residence, Officer High opined B. Robinson, Schaeffer, and Acosta were involved in an indoor and outdoor marijuana grow operations (Ex. 2 p. 10). Law enforcement investigated Schaeffer, and discovered:

1. Schaeffer is the owner of land at 6300 Blarney Way, Pilot Hill, California, and the property of 2329 Edison Avenue, Sacramento, California (Ex. 2 p. 10);
2. Schaeffer's mailing address was 3301 Pope Avenue, Sacramento, California, a property which she co-owns with her husband, Brian Haines (Haines) (Ex. 2 p. 10);
3. Schaeffer's Pope Avenue address had a wrought iron gate and a high fence, which the law enforcement associated with illicit activities (Ex. 2 p. 10);

4. the property at 2329 Edison Avenue, Sacramento, California has a high electricity bill, and it is rented to tenants (Ex. 2 p. 11);
5. they property at 2329 Edison Avenue, Sacramento has air conditioners but the blinds were closed and weren't swaying (Ex. 2 p. 11);
6. the land at 6300 Blarney Way, Pilot Hill, California, has two tent-like structures on the property, one had approximately 121 white plastic buckets in it, with sticks sticking out of them, and the other structure had equipment used to dry marijuana after it is cut from the plant (Ex. 2 p. 11);
7. there were a large amount of marijuana trimmings and leaves scattered on the floor inside the structure at 6300 Blarney Way, Pilot Hill (Ex. 2 p. 11);
8. there were large water tanks, fed by an electric water pump at 6300 Blarney Way, Pilot Hill (Ex. 2 p. 12); and
9. there were about 100 holes in the ground on another area at 6300 Blarney Way, Pilot Hill (Ex. 2 p. 12).

On November 1, 2013, law enforcement searched 6300 Blarney Way in Pilot Hill, California, and located one marijuana plant, marijuana trimmings, and articles associated with a marijuana grow operation (Ex. 2 p. 12).  Additionally, Officer High discovered that in August, 2012, a neighbor reported someone was growing marijuana on the Blarney Way property, but Schaeffer did not purchase this property until March, 2013 (Ex. 2 p. 12).

Based on the evidence found at B. Robinson's residence, and Officer High's affidavit, on November 7, 2013, a search warrant was issued for (1) Schaeffer's person, (2) the residence at 3301 Pope Avenue, Sacramento, California, and (3) the residence at 2329 Edison Avenue, Sacramento, California (Ex. 1).  Law enforcement conducted the search on November 8, 2013, and found evidence linking Schaeffer to B. Robinson's marijuana growing operation (Ex. 3).

Schaeffer arrived after the officers began the search (TR. 31).  When Schaeffer arrived, there were five officers at the house, wearing "modified uniforms"—casual clothes (jeans and shirts) with vests with the word "police" on them (TR. 18).  The officers were armed with their guns, and the first one or two may have had their weapons pointed at Haines when they made entry into the house (TR. 26).  However, once the house was cleared, the weapons were holstered (TR. 26).  When Schaeffer came to the house, one of the law enforcement officers searched her, took her phone (TR. 29), and advised her the law enforcement officers were executing a search warrant, and provided her a copy of the warrant (TR. 30).  Schaeffer was told she could wait or leave (TR. 30, 33), she said she would wait (TR. 33).

Schaeffer sat on the retaining wall attached to the driveway while she spoke to Officer High and Officer Rowlett (TR. 31-32). She was wearing a sweatshirt and pajama pants (TR. 32). There were no other officers nearby when Officer High initially talked to Schaeffer, but Officer Rowlett later joined in the conversation (TR. 34). Officer Rowlett did not interrupt the conversation between Schaeffer and Officer High, and he was standing three or four feet away (TR. 35). Officer High asked Schaeffer if she would be willing to talk to him, and she said yes (TR. 34). The entire conversation between Schaeffer and Officer High lasted approximately five to ten minutes (TR. 34). Officer High ended the conversation because he felt Schaeffer was not being honest (TR. 34-35). Officer Rowlett spoke to Schaeffer after Officer High ended the conversation (TR. 35). Schaeffer was calm and monotone in her responses (TR. 36). She did not seem to be agitated or upset (TR. 36). There was nothing in her behavior or in the conversation between Schaeffer and Officer High that led Officer High to believe Schaeffer was under the influence of any type of substance (TR. 37). Schaeffer did not cry or have difficulty breathing (TR. 37). Officer High never raised his voice, and neither did Schaeffer (TR. 37). Neither Officer High, nor Officer Rowlett made any threats or promises or pointed their weapons at Schaeffer (TR. 37-38). At the time of the conversation, Officer High was aware Schaeffer obtained a college degree (TR. 38). Schaeffer was never hand-cuffed or restrained (TR. 41). Over a year later, on June 1, 2015, Schaeffer was arrested and indicted for conspiracy to distribute marijuana (Filing No. 1).

## CONCLUSIONS OF LAW

### A. Probable Cause

"When the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." ***United States v. O'Dell***, 766 F.3d 870, 874 (8th Cir. 2014) (internal quotation marks omitted). An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects and place. 2 Wayne R. LaFave, ***Search & Seizure***, Section 3.7(d) at 412 (4th ed. 2004). When reviewing the sufficiency of an affidavit "[a] totality of the

4

circumstances test is used to determine whether probable cause exists. Courts should apply a common sense approach and, considering all relevant circumstances, determine whether probable cause exists." ***United States v. Hager***, 710 F.3d 830, 836 (8th Cir. 2013). "Probable cause is established when there is a fair probability that the object of the search warrant may be found in the place to be searched." ***United States v. Romo-Corrales***, 592 F.3d 915, 919 (8th Cir. 2010) (internal quotation omitted). As the Supreme Court stated in ***Illinois v. Gates***:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

***Illinois v. Gates***, 462 U.S. 213, 238 (1983).

During the search of B. Robinson's residence, besides the large amount of cash, law enforcement found a spreadsheet with line items of capital, which Officer High believed to be a marijuana growing operation for more than just personal use (Ex. 2 p. 6). For example, the spreadsheet showed the purchase of a tractor, relating to a large grow operation, and the purchase of an RV, relating to a place for a caretaker to live on the property, and Schaeffer's name was associated with repairs done to an RV (Ex. 2 p. 7). There were receipts from a business called Robinson Sand and Gravel, with the name "Cook" on them, and an address of 6200 Blarney, Pilot Hill, California (Ex. 2 p. 8). The address was a vacant lot, in a remote area of California (Ex. 2 p. 8). There were Home Depot invoices with Schaeffer's name as the purchaser, listing Schaeffer's phone number and her Pope Avenue residence (Ex. 2 p. 8). The invoices were for over $500 worth of PVC pipe, and for almost $800 worth of items associated with a "greenhouse"—hoses, shovels, and extension cords (Ex. 2 p. 8). Officer High also reviewed paperwork with Schaeffer's email address on it, referencing her purchase of a large water tank (Ex. 2 p. 8).

Further research led law enforcement officers to 6300 Blarney Way in Pilot Hill, California, where they found two tent-like structures on the property (Ex. 2 p. 11). One contained approximately 120 white plastic buckets, with sticks sticking out of them,

which are commonly used as planters to plant marijuana (Ex. 2 p. 11). The other structure had equipment used to dry marijuana after it is cut from the plant (Ex. 2 p. 11). Officers saw a "large amount" of marijuana trimmings and leaves scattered on the floor inside the structure (Ex. 2 p. 11). Officers also saw two large water tanks, fed by an electric water pump on the property (Ex. 2 p. 12). Officers saw hoses running away from the pumps and east down a small hill (Ex. 2 p. 12). Officer High opined this equipment was consistent with the purchases Schaeffer and Haines made at the Home Depot, evidenced by the receipts he reviewed coming out of B. Robinson's home (Ex. 2 p. 12). In another area on the property, officers saw about 100 holes in the ground (Ex. 2 p. 12). Officer High opined the holes were where marijuana plants had been growing (Ex. 2 p. 12).

During the search of B. Robinson's home, Officer High found a $665.37 power bill for a residence at 2329 Edison Avenue, Sacramento, California, which is owned by Schaeffer (Ex. 2 p. 11). The residence is a small, single family home (Ex. 2 p. 11). This electric bill Officer High found was dated May 1, 2013 (Ex. 2 p. 11). However, Officer High found a power bill from March, 2013, for the same house for $157.39 (Ex. 2 p. 11). Officer High went to this house and found all the blinds were closed (Ex. 2 p. 12). The house had four window air conditioning units (Ex. 2 p. 12). Officer High opined, based on the exterior of the home and the high electricity bill, Robinson was conducting an indoor marijuana grow operation in the home (Ex. 2 p. 12).

Given all the circumstances presented above, Officer High drew a logical, common-sense conclusion that the Robinsons and Schaeffer were engaged in a marijuana grow operation (Ex. 2 p. 12). Officer High reasonably believed the items associating Schaeffer to the cultivation and sales of marijuana would be found in Schaeffer's Pope Avenue residence, and the time between the investigation and the issuance of the warrant was reasonable (Ex. 2 p. 12). Therefore, the search warrant affidavit did not lack probable cause, and the magistrate judge did not err in issuing the warrant.

### B. *Leon* Good Faith

Schaeffer contends law enforcement failed to act in good faith when relying on the warrant, because it could not lead to an objectively reasonable belief in the existence of probable cause. **See** Filing No. 121 - Motion to Suppress. "Ordinarily, '[e]vidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" *United States v. Cannon*, 703 F.3d 407, 412 (8th Cir. 2013) (**quoting** *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011)) (internal quotation marks omitted). The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Leon*, 468 U.S. 897, 906 (1984) (citation omitted); **see also** *United States v. Hamilton*, 591 F.3d 1017, 1027 (8th Cir. 2010). "Because exclusion is a prophylactic remedy, however, there are some instances where a Fourth Amendment violation does not trigger the exclusionary rule." *Cannon*, 703 F.3d at 412. One such instance or exception to the exclusionary rule occurs "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even if the warrant is subsequently invalidated. *Leon*, 468 U.S. at 920-21. However, the good-faith exception does not apply in the situation "when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (**citing** *Leon*, 468 U.S. at 923).

In this case, as discussed above, together with all the circumstances presented as the result of the search from B. Robinson's residence and further investigation conducted on Schaeffer and her properties, Officer High reasonably believed probable cause existed, and there was a fair probability the items associated Schaeffer to the cultivation and sales of marijuana at the place to be searched. The affidavit in support of the warrant is not lacking in indicia of probable cause, and therefore, law enforcement has no reason to believe the warrant was entirely unreasonable. Law enforcement acted in good faith when relying on the warrant.

7

### C. Voluntariness of Statements

Schaeffer moves for (a) a *Jackson v. Denno* hearing outside the presence of the jury to determine the admissibility of any admissions or confessions made by Schaeffer to any law enforcement officers or agents during the search on November 8, 2013; and (b) suppression of such evidence.

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). "Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Jackson v. Denno*, 378 U.S. 368, 376-77 (1964). "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011) (**quoting** *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004)). "To determine whether a confession is voluntary, we look at 'the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused.'" *United States v. Wallace*, 713 F.3d 422, 426 (8th Cir. 2013) (internal citations omitted). The court will consider, among other factors, "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (**quoting** *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012)). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Perry*, 714 F.3d 570, 574 (8th Cir. 2013) (**quoting** *LeBrun*, 363 F.3d at 724).

> The mere fact that an officer may have elicited a confession "through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," does not render a confession involuntary unless "the overall impact of the interrogation caused the defendant's will to be overborne."

*Boslau*, 632 F.3d at 428-29 (internal citations omitted).

A law enforcement official is required to advise an individual of his or her *Miranda* rights before questioning if that individual is in custody. *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014). The "ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (internal citations omitted). Whether an individual was in custody is an objective inquiry and a court considers the totality of the circumstances confronting the individual. See *J.D.B. v. North Carolina*, 564 U.S. 261, 268 (2011); *Williams*, 760 F.3d at 814.

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. . . . [T]he court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

*J.D.B.*, 564 U.S. at 270 (**quoting** *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)); **see also** *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013). The Eighth Circuit identified the following six non-exclusive factors to consider when determining whether an individual is in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
> (5) whether the atmosphere of the questioning was police dominated; or,
> (6) whether the suspect was placed under arrest at the termination of the questioning.

*Diaz*, 736 F.3d at 1148-49 (**quoting** *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). Application of these factors is not mechanical and the issue of whether an

individual is in custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Long*, 30 F. Supp. 3d 835, 865 (D. S.D. 2014), aff'd, 797 F.3d 558 (8th Cir. 2015) (internal citations omitted). The presence or absence of any one factor is not determinative on the issue. **See** *Griffin*, 922 F.2d at 1348. Instead, a court must "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." *United States v. Laws*, 819 F.3d 388, 396 (8th Cir. 2016) (internal citations omitted). "When a person is questioned on his own turf, we have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (internal citation and quotation marks omitted). In a suspect's own home, the suspect "may be confident, indignant, or recalcitrant, . . . more keenly aware of his rights and more reluctant to tell of his indiscretions and criminal behavior within the walls of his home." *Williams*, 760 F.3d at 815 (**quoting** *Miranda v. Arizona*, 384 U.S. 436, 449-450 (1966)); **see also** *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."). "Any warrant search is inherently police dominated; there is nothing untoward about that circumstance." *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011). If a defendant was not in custody, then the protections of *Miranda* do not apply. *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003) (holding a defendant who "was not subject to custodial interrogation . . . was not entitled to the protections of *Miranda*").

      Schaeffer argues there were approximately twenty law enforcement officers and officials at her home when she was away. **See** Filing No. 120 - Brief p. 2. Many of them were in body armor, and at least two officers pointed rifles at Schaeffer's husband, Haines. *Id.* Schaeffer contends she was in shock when asked which "Brians" she knew, and she couldn't think clearly enough to mention her husband, Haines. *Id.* Schaeffer contends while neither Officer High nor Officer Rowlett told her she was

10

required to answer their questions, the surrounding circumstances made her feel she was compelled to answer the questions. *Id.*

Schaeffer was not present at the time to witness her door being battered down (TR. 28-29). When Schaeffer arrived, there were five officers at the house, wearing "modified uniforms"—casual clothes (jeans and shirts) with vests with the word "police" on them (TR. 18). The officers were armed with their guns, and the first one or two may have their weapons pointed at Haines when they first made entry into the house, but once the house was cleared, the weapons were holstered (TR. 26). When Schaeffer came to the house, one of the officers searched her, took her phone (TR. 29), and advised her the law enforcement officers were executing a search warrant, and provided her a copy of the warrant (TR. 30). She was told she could wait or leave (TR. 30, 33), but she said she would wait (TR. 33).

Schaeffer sat on the retaining wall attached to the driveway, wearing comfortable clothes while she spoke to Officer High and Officer Rowlett (TR. 31-32). Schaeffer said yes when asked if she would like to talk to Officer High (TR. 34). Officer Rowlett did not interrupt the conversation between Schaeffer and Officer High, and he only spoke to Schaeffer after Officer High ended the conversation (TR. 35). Schaeffer did not seem to be agitated or upset (TR. 36), or under the influence of any type of substance (TR. 37). Officer High never raised his voice, and neither did Schaeffer (TR. 37). Neither Officer High, nor Officer Rowlett made any threats or promises, or pointed their weapons at Schaeffer (TR. 37-38). Schaeffer was never hand-cuffed or restrained (TR. 41). At the time of the conversation, Schaeffer was a fifty-year-old, college-educated woman who chose to stay and talk to police officers while sitting in her driveway. All the surrounding circumstances indicate her will was not overborn, she was not in custody, she was not entitled to the protections of *Miranda*, and therefore, all the statements she made to Officers High and Rowlett were not involuntary.

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that:**

1. Cuc Thi Schaeffer's Request for *Jackson v. Denno* Hearing (Filing No. 119) be denied with respect to suppression of statements.

2. Cuc Thi Schaeffer's Motion to Suppress Evidence and Statements (Filing No. 121) be denied.

## ADMONITION

Pursuant to NECivR 72.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 10th day of August, 2016.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge